1   KAREN A. OVERSTREET
    Chief Bankruptcy Judge
2   United States Courthouse
    700 Stewart St., Suite 6310
3   Seattle, WA  98101
    206-370-5330
4

5                    UNITED STATES BANKRUPTCY COURT
                     WESTERN DISTRICT OF WASHINGTON
6                              AT SEATTLE

7   In re                        )
                                 )          Chapter 7
8   CATHERINE DIANE WISEMAN,     )
                                 )
9                                )
                 Debtor.         )
10                               )          Bankruptcy No. 07-10976
                                 )
11  _____)
                                 )
12  UNITED STATES TRUSTEE,       )          Adversary No. 07-1158
                                 )
13                               )
                 Plaintiff,      )
14                               )
    V.                           )          **MEMORANDUM DECISION**
15                               )
    CATHERINE DIANE WISEMAN,     )
16                               )          **NOT FOR PUBLICATION**
                                 )
17                               )
                 Defendant.      )
18  _____)

19       This matter came before me for trial on June 10, 2008.  After

20  hearing the evidence and oral argument I took the matter under

21  advisement so that I could review more carefully the exhibits

22  admitted at trial.  This Memorandum Decision contains my findings

23  of fact and conclusions of law for purposes of Bankruptcy Rule

24  7052.  I have jurisdiction of this matter pursuant to 28 U.S.C.

25

26

27

28

    MEMORANDUM DECISION - 1

§§ 157 and 1334 and this is a core proceeding under 28 U.S.C. § 157(b)(2)(I).[1]

For the following reasons, I find that the discharge of the defendant, Diane Wiseman ("Defendant"), should be denied pursuant to §§ 727(a)(2), 727(a)(3)(A), 727(a)(4) and 727(a)(5)(A).

## I. Summary of Action

The United States Trustee ("UST") seeks to deny Defendant's discharge pursuant to (a) 11 U.S.C. § 727(a)(2) for the concealment and/or transfer of assets with intent to hinder, delay, or defraud a creditor or the chapter 7 trustee; (b) 11 U.S.C. § 727(a)(3)(A) for concealing, destroying, or failing to keep or preserve recorded information; (c) 11 U.S.C. § 727(a)(4) for knowing and fraudulent false oaths relating to material facts that were made in or in connection with the chapter 7 case; (d) 11 U.S.C. § 727(a)(5)(A) for failing to account for substantial funds; and (e) 11 U.S.C. §727(a)(6)(A) for refusing to obey a lawful order of this Court.

The Defendant asserts the affirmative defense that she was clinically depressed at the time the schedules and statements were prepared and signed and consequently was incapable of forming any intent to hinder, delay or defraud creditors or the trustee. She also contends that she relied on attorneys whom she had known, both personally and professionally, for more than 20 years, and who had represented her in all of her legal affairs. She argued at trial that she had a right to rely on their knowledge of her legal

---

[1] Unless otherwise indicated, all Code, Chapter, Section and Rule references are to the Bankruptcy Code, 11 U.S.C. §§101 *et seq.* and to the Federal Rules of Bankruptcy Procedure [Interim], Rules 1001 *et seq.*

MEMORANDUM DECISION - 2

affairs, especially given the long personal and attorney client relationship.

## II. Findings of Fact[2]

On March 8, 2007 (the "Petition Date"), the Defendant filed a voluntary chapter 7 petition (the "Petition") in the Western District of Washington, case no. 07-10976 (the "Chapter 7 Case"). The trustee in the Chapter 7 Case is Edmund Wood (the "Trustee"). In conjunction with the Chapter 7 Case, the Defendant filed schedules of assets and liabilities (each an "Initial Schedule" and collectively, the "Initial Schedules") and a statement of financial affairs (the "Initial SOFA"). The Defendant signed the Petition, Initial Schedules, and Initial SOFA under penalty of perjury as being true and correct.

On the Petition Date, the Defendant's Key Bank checking account balance was approximately $6,100 (the "Petition Date Funds"). Initial Schedule B states that the total amount of money in Defendant's checking accounts on the Petition Date was $100. Defendant testified that she believed that a number of checks were written on the account prepetition but cleared the checking account postpetition.

On the Petition Date, the Defendant had an interest in jewelry (the "Jewelry") including a ring with a diamond solitaire (the "Ring"). The purchase price for the ring was less than $5,000. Defendant obtained an appraisal that valued the Ring at $1,000. Pursuant to an order of the Court, Defendant turned the ring over

_____

[2] Most of the following factual findings come directly from the admitted facts in the parties' pretrial order at Docket No. 29.

MEMORANDUM DECISION - 3

to the Trustee.  On Initial Schedule B, Defendant marked "None" in response to whether she had an interest in jewelry.  She contends that the Ring was disclosed as part of the $5,000 of "Home Furnishings" listed on Line 4 of Initial Schedule B.

On or about January 1, 2000, the Defendant, her husband Jim Wiseman, and the Defendant's company Exceptional Escrow Corporation ("Seller") entered into an Asset Purchase Agreement ("Sale Contract") with Ocean Shores Escrow, Inc./Northbeach Exchange Corporation (the "Buyer") and Douglas Tyler and Catherine Tyler ("Buyer's Shareholders").  Under the Sale Contract, the Buyer agreed to pay the Seller $15,000 for certain assets.  The Buyer also agreed to pay the Defendant and Jim Wiseman $345,000 to enter into non-competition agreements.  In conjunction with the Sale Contract, the Buyer signed a promissory note payable to the Seller, the Defendant, and Jim Wiseman in the sum of $360,000 (the "Account Receivable").  All of the Buyer's obligations were personally guaranteed by each of the Buyer's Shareholders.  Although some interest-only payments were made on the Account Receivable for approximately one year, thereafter the Buyer defaulted on its payment obligations.  The Account Receivable was never paid by the Buyer, or by the Buyer's Shareholders under their personal guarantees.  One of the Buyer's Shareholders, Douglas Tyler, received a chapter 7 discharge on May 16, 2006, in case no. 05-50911, filed in the Western District of Washington.  Prior to his bankruptcy filing, the Buyer's Shareholders had divorced. On Initial Schedule B, the Defendant marked "None" in response to whether she had an interest in any account receivable.

MEMORANDUM DECISION - 4

In December 2006, a wind storm caused a tree or part of a tree to damage a house owned by the Defendant located at 17807 E. Lake Desire Drive S.E., Renton, WA (the "Lake House"). The Defendant submitted a claim relating to the damage to Farmers Insurance (the "Wind Damage Claim"). On or about January 19, 2007, as a result of the Wind Damage Claim, the Defendant received a check from Farmers Insurance in the amount of $11,892.74 (the "Prepetition Insurance Payment"). On March 7, 2007, the Defendant faxed a final bid for repair work on the Lake House related to the Wind Damage Claim to an adjuster at Farmers Insurance ("the Final Bid"). The Final Bid was in the amount of $22,687.97. Postpetition, on or about April 6, 2007, the Defendant received a second check from Farmers Insurance relating to the Wind Damage Claim in the amount of $13,550.79 (the "Postpetition Insurance Payment"). Initial Schedule B does not disclose the Defendant's entitlement or expectation to receive additional funds postpetition from Farmers Insurance relating to the Wind Damage Claim. The Defendant did not inform the Trustee of receipt of the Postpetition Insurance Payment, and did not turn the funds over to the Trustee. Instead, Defendant testified that she used the funds to pay contractors who had worked on the Lake House and to pay herself and her husband for work they had done on the Lake House related to the wind damage.

On the Petition Date, the Defendant owned three horses, two of which are thoroughbreds (collectively, the "Horses"). On Initial Schedule B, the Defendant marked "None" in response to whether she had an interest in any animals. She listed $500 in "Animal" expenses on Line 17 of Initial Schedule J.

MEMORANDUM DECISION - 5

The Defendant was a party to at least five lawsuits within one year immediately preceding the Petition Date (collectively, the "Prepetition Litigation").  The Prepetition Litigation is not listed in the Initial SOFA and, in response to question number 4a on the Initial SOFA, the Defendant indicated "None."  Leen & O'Sullivan represented the Defendant in the Prepetition Litigation. According to the testimony of Defendant, Sheila O'Sullivan and David Leen, of the firm of Leen & O'Sullivan had represented Defendant in her legal affairs for approximately 30 years.

On the Petition Date, the Defendant had a legal interest in a 1995 Geo Prizm and a 1997 Geo Prizm (collectively, "the Vehicles"). Initial Schedule B does not disclose the Defendant's interest in the Vehicles.  Defendant testified that one Prizm belonged to her son and that she merely co-signed the loan he took out to buy the car.  She believed he had paid the car off and her name had been removed from the title.  Defendant testified that the other Prizm belonged to her step son and she did not realize that her husband's name was still on the title to that vehicle.  The Trustee has not taken any action as to these vehicles as they do not appear to have value for creditors.

The Defendant had an interest in a 45-foot Bayliner boat (the "Bayliner") that was repossessed prepetition by Key Bank in February 2007 or early March 2007.  The repossession of the Bayliner is not disclosed in the Initial SOFA and, in response to question number 5 (which requires disclosure of repossessions within one year of bankruptcy) on the Initial SOFA, the Defendant marked "None."

MEMORANDUM DECISION - 6

In August 2005, the Defendant refinanced the Lake House (the "Refinance"). As part of the Refinance transaction the Defendant received approximately $42,000 in net proceeds ("Refinance Proceeds") and executed a new deed of trust to Viking Bank to secure the new loan. There is nothing in the Initial Schedules or the Initial SOFA referring to the Refinance or receipt by the Defendant of the Refinance Proceeds.

At the meeting of creditors held on April 12, 2007 (the "Creditors' Meeting"), the Defendant testified under oath that she reviewed and signed the Petition, Initial Schedules and Initial SOFA; all of the information in the Petition, Initial Schedules and Initial SOFA was true and correct; all of her assets and debts were disclosed in the Initial Schedules and Initial SOFA; and there were no errors or omissions in the Initial Schedules or Initial SOFA that needed to be brought to the Trustee's attention. Although Defendant's responses at the Creditors' Meeting were mostly "yes" or "no" responses, I conclude from reading the Section 341 transcript (Ex. P-25) that Defendant understood the questions being asked and her responses. The Trustee, Edmund Wood, testified at trial that when he examined Defendant at the 341 meeting he had no concern that she had mental problems or was unable to understand the proceedings.

On March 17, 2007, Defendant filed a motion to convert her case to a chapter 11. (07-10976; Docket No. 13). The Trustee objected to the motion on the grounds that Defendant might be subject to claims for fraud related to her escrow company's closing of a refinancing transaction in connection with the Lake House. The Trustee was also concerned that Defendant had conflicts of

MEMORANDUM DECISION - 7

interest preventing her from executing her duties as a debtor in possession.  *See* Trustee's objection at Docket No. 34, 07-10976). On May 3, 2007, the Defendant signed a Declaration in support of her reply to the Trustee's objection to her request to convert her case to a chapter 11.  Ex. P-10.  In that declaration, Defendant attested that she was competent to testify as to the factual contentions contained therein, which included contentions concerning her husband's health, the refinance of the Lake House, the failure of her business (Exceptional Escrow) to satisfy the Key Bank Deed of Trust against that property in connection with the refinance, and the circumstances of the subsequent increase in the debt secured by that lien.

Attorney Charles A. Johnson testified he had agreed to assist Defendant in filing a chapter 11 proceeding, but he was not going to be available in March when the case needed to be filed.  He had agreed with Ms. O'Sullivan, the attorney who filed the Chapter 7 Case, that they could convert the case to chapter 11 upon his return.  Mr. Johnson met with Defendant on April 12, 2007 to discuss conversion of her case to a chapter 11.  He further testified that at that time he found her to be competent to perform the duties of a Chapter 11 debtor in possession.  In fact, he described her as "professional and smart".  In their two hour meeting he found her to be responsive to his questions and believed that she understood the requirements for chapter 11.  At this initial meeting, Defendant did not tell Mr. Johnson about any investigation being conducted by the State of Washington Department of Financial Institutions.  She did, however, advise Mr. Johnson of this investigation during their second meeting in May of 2007,

MEMORANDUM DECISION - 8

although she did not advise him that the investigation was because of her alleged misdirection of trust funds from her escrow company.

On or about June 8, 2007, the State of Washington Department of Financial Institutions, Division of Consumer Services, issued a Temporary Order to Cease and Desist, no. C-07-190-07-TD01, against the Defendant and her 100% owned corporation Exceptional Escrow Corporation (the "Cease and Desist Order"). In conjunction with, or leading up to issuance of the Cease and Desist Order, the Defendant signed written statements admitting that she had improperly converted to her personal use more than $65,000 of the escrow trust funds in a certain IOLTA trust account (the "Trust Account Funds"). The Trust Account Funds have not been repaid.

There are no creditors listed in the Initial Schedules relating to the Defendant's admitted conversion and use of the Trust Account Funds (the "Trust Account Creditors"). Nothing in the Initial Schedules or the Initial SOFA refers to or discloses the Defendant's receipt or use of the Trust Account Funds. Within eight years of the Petition Date, the Defendant and Jim Wiseman did business as a sole proprietorship under the name "Pet Friendly" (UBI: 601978195) and as a sole proprietorship under the name "Davit Solutions" (UBI: 602462167). Pet Friendly and Davit Solutions are not listed on the Petition as trade names used by the Defendant in the last eight years. Davit Solutions is listed as a sole proprietorship on Line 13 of Schedule B.

On June 8, 2007, the Defendant filed an amended Schedule B, Schedule C, and Schedule F ("the First Amended Schedule B," "the First Amended Schedule C," "the Amended Schedule F," and, collectively, "the Amended Schedules"), and an amended Statement of

MEMORANDUM DECISION - 9

Financial Affairs ("the Amended SOFA"). The Amended Schedules and Amended SOFA disclosed and addressed in various ways the Jewelry, the Account Receivable, the Wind Damage Claim, the Prepetition Insurance Payment, the receivable that lead to the Postpetition Insurance Payment, the Horses, the Prepetition Litigation, the Bayliner repossession, the Refinance, the Refinance Proceeds, the Vehicles, and formerly doing business as Davit Solutions.

The Amended Schedules and Amended SOFA did not disclose or otherwise address the Petition Date Funds, use of the trade name Pet Friendly, receipt of the Trust Account Funds, and Trust Account Creditors. On November 9, 2007, the Defendant filed an amended Schedule B ("the Second Amended Schedule B") and an amended Schedule C ("the Second Amended Schedule C"). The Second Amended Schedule B disclosed the existence of the Petition Date Funds.

On November 16, 2007, the Court entered an Order Directing Catherine D. Wiseman and the Marital Community of Jim and Catherine Wiseman to Turnover Certain Assets to the Trustee and Denying Any Exemption Claims for Those Assets (the "Turnover Order"). The Turnover Order required the Defendant to remit $19,585.64 to the Trustee. The Defendant has not remitted the funds required by the Turnover Order. Defendant testified that she received the order, but did not have funds to comply with the terms of the order. She did not explain why she was lacking funds to comply with the order but was able to obtain approximately $40,000 from a relative to cure the delinquency in her home mortgage.

The Defendant's husband, Jim Wiseman, testified that during the period before and after the Petition Date the Defendant was essentially in a "catatonic state" and unable to do anything other

MEMORANDUM DECISION - 10

than sit in a chair clutching an afgan blanket. He further
testified that she was unable to work and that he feared she might
commit suicide. Defendant's attorneys Sheila O'Sullivan and David
Leen testified that in their prior dealings with Defendant over
many years she was usually very organized and efficient. They
further testified that around the Petition Date, Defendant was
suffering a great deal of anxiety and was not her usual self. Both
attorneys admitted, however, that they believed Defendant was
competent to understand and execute the Initial Schedules and
Initial SOFA. Defendant testified that she signed the Initial
Schedules and SOFA but did not really read them.

Defendant called Albert Reichert, her "life coach" and a
retired developmental and behavioral pediatrician, to testify as to
her mental condition. Dr. Reichert testified that he had known
Defendant from his treatment of her son beginning in May of 1988.
Dr. Reichert retired from his practice in 2005 and since then has
been self-employed as a "life coach." On September 29, 2007, six
months after the petition was filed, Dr. Reichert interviewed
Defendant at her request. During the interview, Defendant related
to Dr. Reichert what her feelings had been over the prior six
months. Based upon that interview and one or more sessions
following September 29, 2007 (the evidence is not clear as to how
many sessions were held), Dr. Reichert concluded that Defendant was
suffering from severe depression at the time of the September
interview and six months earlier when Defendant was preparing for
and filing bankruptcy.

At the September 2007 interview, Defendant told Dr. Reichert
that at the time she filed bankruptcy she had insomnia, she was

MEMORANDUM DECISION - 11

unable to think, she could not carry out daily functions such as shopping, and that she was immobilized during the whole day. Dr. Reichert concluded, based upon this description, that Defendant met the criteria for depression. Dr. Reichert described the typical symptoms of someone suffering from depression or being in a "catatonic state" as including being unable to move, sitting with blank stare and not in touch with their environment, suffering anxiety and paranoia, and being unable to pay attention to details. Dr. Reichert, however, had no personal contact with Defendant at any time shortly before or after the Petition Date.

Prior to the Petition Date, Defendant had many things to be anxious about: her personal financial situation and that of her company, Exceptional Escrow, were dire, she was facing the loss of her home, the Lake House had been damaged in a windstorm, her boat was repossessed, and her husband was ill. Subsequent to the bankruptcy filing, she faced additional stress in the closure of her escrow business and investigation by the Washington State Department of Financial Institutions beginning in April of 2007. Defendant admitted to investigators that in 2006 she had "converted to her personal use more than $65,000 of the escrow trust funds...." Ex. P-15, ¶ 1.9. The investigation led to the issuance of the Cease and Desist Order, which required Defendant to immediately shut down her escrow business and prevented her from disbursing any of the company's funds. Ex. P-15. In June of 2007, Defendant admitted in writing that she removed funds that did not belong to her from a company trust account. Ex. P-16. At trial Defendant testified that she had used the funds to pay expenses of Exceptional Escrow, but she provided no documentation to

MEMORANDUM DECISION - 12

substantiate that testimony.  She claimed she was unable to obtain
documentation concerning the use of the funds because all of her
company records are under the control of the Washington State
Department of Financial Institutions.  She offered no evidence that
she requested the records she needed from the department.

Defendant was very emotional at trial, weeping through most of
her testimony and during the testimony of the other witnesses.
Mr. Wiseman testified that Defendant's condition had improved as of
the time of the trial and that she was functioning well on her new
job.

### III. Conclusions of Law

Based upon the foregoing findings of fact, the Court makes the
following conclusions of law.

A.  <u>Burden of Proof</u>.

The UST has the burden of proving the elements of a cause of
action for nondischarge by a preponderance of the evidence.  *In re
Lawler*, 141 B.R. 425, 429 (Bankr. 9th Cir. 1992).  Injury to
creditors is not a prerequisite to denying a discharge in
bankruptcy.  *In re Bernard*, 96 F.3d at 1282; *First Beverly Bank v.
Adeeb (In re Adeeb)*, 787 F.2d 1339, 1343(9th Cir. 1986).  In
addition, a debtor cannot escape denial of discharge by asserting
that omitted information concerned a worthless business
relationship or holding.  *Job v. Calder (In re Calder)*, 907 F.2d
953, 955 (10th Cir. 1990).

Objections to discharge are liberally construed in favor of
the debtor and strictly against the objecting party.  *In re
Bernard*, 96 F.3d 1279, 1281 (9th Cir. 1996).  Despite this

MEMORANDUM DECISION - 13

construction, the bankruptcy discharge is equitable in nature and is intended only for honest debtors. *Id.; Adeeb*, 787 F.2d at 1345.

### B.  Reliance on Advice of Counsel.

As to the causes of action below which require the UST to prove unlawful intent on Defendant's part, Defendant contends that she relied on counsel and therefore could not have formed the requisite intent.  Both parties acknowledge the general rule that while a debtor's reliance on the advice of her attorney may be used to prove the debtor lacked the requisite intent, the debtor's reliance must be in good faith. *Adeeb,* 787 F.2d at 1343.  In *Adeeb*, the court denied the defense of reliance of counsel where it found that the debtor intended to hinder his creditors when he made certain prepetition transfers.  The court held "Such a finding precludes the defense of good faith reliance on the advice of an attorney even if the client is otherwise innocent of any improper purpose. A debtor who knowingly acts to hinder or delay his creditors acts with the very intent penalized by section 727(a)(2)(A)." *Id*. at 1343.

### C.  Denial of Discharge Under Section 727(a)(2).

The UST contends that Defendant's discharge should be denied pursuant to Section 727(a)(2) because Defendant had the intent to hinder, delay, or defraud her creditors or the Trustee when she concealed: (1) the Petition Date Funds, (2) the Jewelry, (3) her interest in the Vehicles, (4) her interest in the Account Receivable, (5) the Wind Damage Claim, (6) the receipt of the Prepetition Insurance Payment, (7) her entitlement or expectation to receipt of the Postpetition Insurance Payment, (8) her interest in the Horses, (9) the Prepetition Litigation, and (10) her

MEMORANDUM DECISION - 14

embezzlement of the Trust Account Funds. There is no dispute that items (1) through (10) were not disclosed by Defendant in the Initial Schedules and Initial SOFA. The Jewelry, the Wind Damage Claim, and the Horses were disclosed by Defendant to her attorneys; however, these items were not listed or disclosed on the Initial Schedules and Initial SOFA. *See* Ex. D-1, Attorneys' Case Information Sheet.

To succeed under Section 727(a)(2), the UST must show that "with intent to hinder, delay, or defraud a creditor or an officer of the estate...." Defendant concealed property of the estate within one year before the Petition Date or property of the estate after the Petition Date. The existence of fraudulent intent may be inferred from the circumstances surrounding the concealment.

Concerning the Petition Date Funds, Defendant testified that she believed $100, which she put as the account balance on her bank account as of the Petition Date in the Initial Schedules, was the correct balance after deducting checks she had written prepetition. The evidence revealed, however, that Defendant wrote the checks from that account to pay for repairs on the Lake House after the Petition Date, so she knew that the balance of the account was more than $100 on the Petition Date.

Defendant disclosed to her attorney that she had a wedding ring and was advised by her attorney that it should be listed under household goods. I held otherwise, but conclude that Defendant did not attempt to conceal this particular asset. Similarly, Defendant disclosed the Horses to her attorney. Ms. O'Sullivan testified that she most likely did not list the horses because they had no value. All assets, regardless of value, must be listed on the

MEMORANDUM DECISION - 15

schedules. Defendant did not reasonably rely on advice of counsel when she signed the Initial Schedules without disclosing the Horses; Defendant knew she had horses and the requirement in Schedule B to list "Animals" is not difficult to understand.

Defendant testified that she did not list the Vehicles on the Initial Schedules even though her name was on the title to one vehicle and her husband's name was on the title to the other. As to the car used by her son, Defendant testified she believed he had paid off the car and removed her name from the title. Defendant did not discuss these assets with her attorneys. The fact that these assets may not have much value to the Trustee is not determinative on the issue of concealment.

The Account Receivable was significant in amount, $360,000. Defendant testified that she did not disclose this amount on the Initial Schedules because she believed the account was uncollectible and therefore worthless. Defendant did not disclose this potential asset to her attorneys. A debtor is required to list all assets on the schedules, regardless of value. It was the Trustee's responsibility to determine the value of the Account Receivable and whether to pursue it. This asset was discovered only because of efforts on the part of the UST.

Defendant appears to have advised her counsel of the wind damage to the Lake House. Whether she advised her attorneys that she had received insurance funds before the Petition Date and that she was due to receive funds after the Petition Date is not clear. Ms. O'Sullivan testified that she would not typically list insurance proceeds of this type on the schedules because the funds would belong to contractors performing the work and not to the

MEMORANDUM DECISION - 16

debtor or the estate.  In this case, however, Defendant testified
that she paid some of the insurance monies to herself and her
husband.  In addition, although the Prepetition Insurance Payment
was evidenced by a check payable jointly to Defendant, her husband
and Countrywide (*See* Ex. P-17), the Postpetition Insurance Payment
was represented by a check payable only to Defendant and her
husband (*Id*).  Defendant knew she would receive additional funds
after she filed her bankruptcy case, as she submitted the Final Bid
to the insurance company one day before the Petition Date.  *See Id*.
Defendant was concerned about getting the repairs to the Lake House
paid notwithstanding the filing of the Chapter 7 Case.  I conclude
that Defendant concealed the Petition Date Funds and the
Postpetition Insurance Payment funds so that she could pay for
those repairs rather than subject those funds to the custody of the
Trustee.

Defendant failed to tell her attorneys that she had converted
approximately $60,000 in funds from her escrow company.  It was not
until the Washington State Department of Financial Institutions
investigation revealed this conversion that Defendant admitted the
existence of additional creditors in her case.  The embezzlement
was significant in that it would lead to the closure of Exceptional
Escrow and the inability of Defendant to successfully pursue a
chapter 11 case.

Defendant's omissions from the Initial Schedules and Initial
SOFA are too many and too selective to be anything other than
intentional.  She contends instead that her compromised mental
state around the Petition Date was the reason she could not have
formed the requisite intent required under Section 727(a)(2)(A).

MEMORANDUM DECISION - 17

Despite Defendant's alleged catatonic state, she, rather than her
husband, dealt with attorneys to prepare and file a bankruptcy
solely in her name. The day before the petition was filed,
Defendant submitted the Final Bid to the insurance company for
repairs to the Lake House. After the Petition Date, Defendant
issued and signed nine checks written on her KeyBank account
payable to various individuals and entities she testified were
working on the repairs to the Lake House. The checks, which are in
Ex. P-27, total $12,057.04. Defendant met with attorney Charles
Johnson immediately after her 341 meeting on April 12, 2007 to
discuss conversion of her case to a chapter 11 and he testified
that she appeared competent at that meeting. In connection with
her request to convert the case, Defendant filed a declaration
attesting to her ability to meet her responsibilities in chapter
11. Although Dr. Reichert testified that Defendant was clinically
depressed on the Petition Date, he had no personal contact with her
during that period of time and his opinion is dependent upon the
truth of Defendant's statements to him six months after the
Petition Date concerning her condition as of the Petition Date.
Therefore, Dr. Reichert's opinion is not entitled to much weight on
the question of Defendant's mental state when she filed bankruptcy.

Based upon the evidence, I find that Defendant was mentally
competent on the Petition Date, she understood the tasks necessary
for preparation of her bankruptcy case, she understood that she was
signing the Initial Schedules and Initial SOFA under oath, she
failed to list significant assets on her Initial Schedules and
Initial SOFA and she thereby intended to hinder her creditors.

MEMORANDUM DECISION - 18

D.   Denial of Discharge under 727(a)(3).

The UST contends that Defendant's discharge should be denied pursuant to Section 727(a)(3) because she concealed, destroyed, or failed to keep or preserve recorded information from which her financial condition or business transactions might be ascertained, including, without limitation, recorded information regarding disposition of the Prepetition Insurance Payment, the Postpetition Insurance Payment, the Petition Date Funds, and the Trust Account Funds.

To prove a prima facie case under Section 727(a)(3), the UST must show (1) that the debtor did not maintain or preserve adequate records, and (2) that such failure makes it impossible to ascertain the debtor's financial condition and material business transactions. *Lansdowne v. Cox (In re Cox)*, 41 F.3d 1294, 1296 (9th Cir. 1994). Section 727(a)(3) does not prescribe any particular form of record-keeping, but "simply requires that the bankrupt present sufficient written evidence which will enable his creditors reasonably to ascertain his present financial condition and to follow his business transactions for a reasonable period in the past." *Rhoades v. Wikle*, 453 F.2d 51, 53 (9th Cir. 1971). The records must have been contemporaneously maintained and sufficiently complete and organized to allow the plaintiff to trace the flow of the debtor's assets. *See In re Strbac*, 235 B.R. 880, 885 (6th Cir. BAP 1999). Creditors are not required to "sift through documents and attempt to reconstruct the flow of the debtor's assets." *Matter of Juzwiak*, 89 F.3d 424, 429 (7th Cir. 1996). Once the plaintiff shows that the debtor's records are insufficient to ascertain the debtor's financial condition and

MEMORANDUM DECISION - 19

business transactions, the burden of coming forward shifts to the debtor to produce " 'additional credible evidence to rebut the proof of insufficient records, or to justify the absence of records.'" *Nemes*, 323 B.R. at 325 (citation omitted). *See also Cox*, 41 F.3d at 1296. To determine whether the debtor is justified in failing to maintain adequate records, courts consider what a "normal, reasonable person should do under similar circumstances." *Meridian Bank v. Alten*, 958 F.2d 1226, 1231 (3rd Cir. 1992) (citation omitted). Factors to be considered by the court include the debtor's education, experience, and sophistication; the volume and complexity of the debtor's business; the amount of credit extended to the debtor; and any other relevant circumstances. *Id*. at 1232. Notably, the debtor's intent to conceal her assets or financial condition is not an element of Section 727(a)(3). *In re Bourgeut*, 176 B.R. 25, 28 (Bankr. C.D. Cal. 1994).

Defendant admitted that she converted trust funds from her business, Exceptional Escrow, and that she spent the Petition Date Funds, the Prepetition Insurance Payment and the Postpetition Insurance Payment. Exhibit P-27 explains only where some of the money went. Defendant failed to present any documentation concerning the foregoing funds which were at one point in her possession. Defendant's true financial condition had to be painstakingly pieced together by the UST from sources other than documentation and information provided by Defendant. Accordingly, Defendant's discharge may be denied under Section 727(a)(3).

E.   <u>Denial of Discharge Under Section 727(a)(4)</u>.

The UST contends that Defendant's discharge should be denied pursuant to Section 727(a)(4) because she acted knowingly and

MEMORANDUM DECISION - 20

fraudulently when she made false oaths regarding her assets.  A
successful claim under this provision requires the plaintiff to
show: "(1) the debtor made a false oath in connection with the
case; (2) the oath related to a material fact; (3) the oath was
made knowingly; and (4) the oath was made fraudulently." *In re*
*Roberts*, 331 B.R. 876, 882 (9th Cir. BAP 2005).  Mere carelessness
or recklessness will not suffice under the third element of this
standard, though "recklessness can be probative of fraudulent
intent." *In re Khalil*, 379 B.R. 163, 173 (9th Cir. BAP 2007);
*Roberts*, 331 B.R. at 883-84.  Fraudulent intent may also be
inferred from cumulative falsehoods.  *In re Hammeken*, 316 B.R. 723,
730 (Bankr. D.Ariz. 2004).

The UST contends that Defendant made false oaths regarding the
existence of the Petition Date Funds, the existence of the Horses,
the existence of the Vehicles, the existence of the Account
Receivable, the existence of the Wind Damage Claim, the Defendant's
receipt of the Prepetition Insurance Payment, the Defendant's
entitlement or expectation to receipt of the Postpetition Insurance
Payment, the Refinance, the Defendant's receipt of the Refinance
Proceeds, the existence of the Prepetition Litigation, the
repossession of the Bayliner, the Defendant's receipt of the Trust
Account Funds, the identity of the Trust Account Creditors, and
Defendant's interest in the Jewelry.

Defendant contends that the above-described omissions were not
material.  A fact is material "if it bears a relationship to the
bankrupt's business transactions or estate, or concerns the
discovery of assets, business dealings, or the existence and
disposition of his property." *In re Khalil*, 379 B.R. 163, 173

MEMORANDUM DECISION - 21

(Bankr. 9th Cir. 2007).  In *In re Maring*, 2008 WL 1780932 at 2 (W.D. Wash. 2008), the court described the materiality prong as a "low bar" for the plaintiff to meet.  Quoting *Adeeb, supra*, the court stated "Furthermore, "[t]he asset's value need not be 'material,' nor must a debtor 'succeed in harming creditors to warrant denial of discharge.' " Id. (quoting *In re Adeeb*, 787 F.2d 1339, 1343 (9th Cir.1986)).

Defendant's cumulative omissions support a conclusion that Defendant acted fraudulently in making false oaths regarding her Initial Schedules and Initial SOFA.  Defendant stated affirmatively at the Section 341 meeting that her Initial Schedules and SOFA were true and accurate when she knew they were not.  It was not until after multiple depositions and significant investigation by the UST's office that all of Defendant's omissions concerning her financial condition were discovered.

Courts have recognized that failure to read the schedules is not a defense to a dischargeability action under Section 727(a)(4)(A).  *See, e.g., In re Leija*, 270 B.R. 497, 503 (Bankr. E.D. Cal. 2001).  *Accord Boroff v. Tully (In re Tully)*, 818 F.2d 106, 111 (1st Cir. 1987)("A debtor cannot, merely by playing ostrich and burying his head deeply enough in the sand, disclaim all responsibility for statements which he has made under oath."). *See also In re Downey*, 245 B.R. 5, 15 (Bankr. D. Idaho 1999)("[A]ttorney error does not absolve a debtor, who signs the petition and schedules under penalty of perjury, from the duty to ensure that information is accurate and complete to the best of his knowledge.").

MEMORANDUM DECISION - 22

Defendant is a sophisticated business person who, in connection with her escrow business, dealt directly with oaths. She should have reviewed the Initial Schedules and Initial SOFA carefully and corrected misstatments. At her Section 341 meeting, she had the chance to correct errors and omissions and failed to do so.

For the foregoing reasons, I conclude that the UST has met its burden under Section 727(a)(4).

F.    Denial of Discharge Under Section 727(a)(5).

The UST initially sought to deny Defendant's discharge under Section 727(a)(5) on the ground that she failed to satisfactorily account for substantial funds, including, without limitation, the Petition Date Funds, the Postpetition Insurance Payment, and the Trust Account Funds. In its reply brief, however, the UST stated that it would pursue this claim only with regard to the Trust Account Funds. I agree that Defendant has failed to account for these funds. Her testimony was merely that she took the Trust Account Funds and put them in the general business account for Exceptional Escrow. She provided no documentation of this transaction, however, claiming that she did not have access to the company books and records in the possession of the Washington State Department of Financial Institutions. It was Defendant's burden to produce this evidence. There is no evidence that she even requested the documents from the Department of Financial Institutions. Accordingly, I find that the UST has met its burden under Section 727(a)(5).

MEMORANDUM DECISION - 23

G.   Denial of Discharge Under Section 727(a)(6).

Finally, the UST requests the Court to deny Defendant's discharge pursuant Section 727(a)(6) on the ground that Defendant has refused to obey the Turnover Order which required her to deliver certain funds to the Trustee, including proceeds of an insurance claim which she received after the petition date.

Given my rulings above that Defendant's discharge should be denied on numerous other grounds, it is not necessary for me to resolve the question of whether willful and intentional disobedience is required to sustain an action under Section 727(a)(6). *See, e.g., In Re of Jarrell,* 129 B.R. 29 (Bkrtcy. Del. 1991)(denial of discharge based upon refusal to comply with a court order requires willful and intentional disobedience); *In re Walter*, 265 B.R. 753 (Bkrtcy. D. Ohio, 2001)(discussing the difference between a refusal and a failure to comply with a court order); *But see United States v. Richardson (In re Richardson)*, 85 B.R. 1008, 1011 (Bankr. W.D. Mo. 1988)(use of the word "refused" in § 727(a)(6) denotes that an action brought under this section should, in substance, simply be treated as a civil contempt proceeding, thereby implicitly negating the intent requirement from the word "refused" as willfulness is not an element to a proceeding in civil contempt); *Rolex Watch U.S.A., Inc. v. Crowley*, 74 F.3d 716, 720 (6th Cir. 1996) (stating "willfulness is not an element of civil contempt, so the intent of a party to disobey a court order is irrelevant to the validity of a contempt finding."). Accordingly, the UST's claim under Section 727(a)(6) will be dismissed as moot.

MEMORANDUM DECISION - 24

**Conclusion**

Based upon the foregoing findings of fact and conclusions of law, the Court finds that the UST has met its burden of proving that Defendant's discharge should be denied under Sections 727(a)(2), (a)(3), (a)(4) and (a)(5). The Court further finds that the UST's claim under Section 727(a)(6) should be dismissed as moot. The UST is instructed to prepare an order in conformance with this Memorandum Decision.

DATED this 17th day of July, 2008

_____
KAREN A. OVERSTREET
UNITED STATES BANKRUPTCY JUDGE

MEMORANDUM DECISION - 25